**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

MAR 0 2 2018

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**THE BURLINGTON INSURANCE COMPANY,**

    **Plaintiff,**

**vs.**　　　　　　　　　　Case No: 4.18cv164-JM

**4162 DOERR ROAD, INC. D/B/A MARSHALL**
**DISTRIBUTING, INC., ROBERT HASKETT,**
**and LAURA HASKETT,**

This case assigned to District Judge _Moody_
and to Magistrate Judge _Volpe_

    **Defendants.**

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Comes the Plaintiff, The Burlington Insurance Company ("Burlington"), by and through

its attorneys, Fuqua Campbell, P.A., and for its Complaint for Declaratory Judgment and Other

Relief against the Defendants, 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. ("MDI"),

Robert Haskett and Laura Haskett (Robert Haskett and Laura Haskett collectively the

"Hasketts"), allege and state the following:

### THE PARTIES

1.　　　Burlington is a North Carolina corporation with its principal place of business in

North Carolina.

2.　　　Upon information and belief, MDI is a Michigan corporation with its principal

place of business in Michigan, and it conducts business in Arkansas.

3.　　　Upon information and belief, Robert Haskett is an individual residing and

domiciled in, and is a citizen of, Arkansas.

4.　　　Upon information and belief, Laura Haskett is an individual residing and

domiciled in, and is a citizen of, Arkansas.

## JURISIDICTION AND VENUE

5.      This is a declaratory judgment action with jurisdiction based upon 28 U.S.C. §2201 and diversity of citizenship (28 U.S.C. §1332). The matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens of different states.

6.      Venue is proper in this judicial district under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claim took place in this judicial district.

7.      This declaratory judgment action pertains to an actual controversy over potential insurance coverage under a Products/Completed Operations Liability Policy (No. HGL0038524) that Burlington issued to 4162 Doerr Road, Inc. and Marshall Distributing, Inc. for the policy period June 6, 2014 to June 6, 2015 (the "Policy"). A copy of the Policy is attached hereto as Exhibit "A".

8.      Burlington asks this Court to judicially declare that the Policy provides no coverage for, and Burlington has no duty to defend or indemnify, any person or entity in connection with a pending lawsuit captioned *Robert Haskett and Laura Haskett v. T.N.H.D. Partners, LLC d/b/a Harley Davidson of Cool Springs; 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.; Power Prime Limited; and John Doe 1, Unknown Defendant* (USDC Eastern District of Arkansas, Case No. 3:16-cv-00047-BSM) (the "underlying action"). A copy of the second amended complaint in the underlying action is attached hereto as Exhibit "B".

## THE UNDERLYING ACTION

9.      The Hasketts filed their complaint in the underlying action on February 9, 2016, their first amended complaint on June 14, 2016 and their second amended complaint on November 29, 2017.

10.     The Hasketts allege that MDI distributed ZOAN-brand helmets to Drasco Trading Post in Drasco, Arkansas, which were designed, manufactured and sold by Power Prime Limited.

11.    The Hasketts allege that on July 5, 2014, Robert Haskett purchased a ZOAN Route 66 model helmet at Drasco Trading Post, for Laura Haskett to use on a motorcycle trip.

12.    The Hasketts allege that Laura Haskett was wearing the ZOAN Route 66 helmet on July 21, 2014, when the Hasketts were involved in a motorcycle accident.

13.    The Hasketts allege that the helmet design was deficient, which caused the strap to tear away from the helmet during the accident, resulting in severe injuries to Laura Haskett.

14.    The Hasketts allege strict liability – defective design, strict liability – defective manufacturing, and negligence claims against MDI.

## PROCURING THE POLICY

15.    In connection with procuring the Policy, MDI and/or others on its behalf represented to Burlington that MDI obtained certificates of product liability insurance from each of its manufacturers/suppliers.

16.    In connection with procuring the Policy, MDI and/or others on its behalf also represented to Burlington that MDI was included as an additional insured-vendor under its manufacturers/suppliers' product liability insurance.

17.    In reliance upon the foregoing and other representations made by or on behalf of MDI, Burlington issued the Policy.

18.    Contrary to its representation, MDI did not obtain a certificate of liability insurance from Power Prime for Power Prime's product liability policy in effect at the time the representation was made to Burlington.

19.    Contrary to its representations, MDI did not ask for and Power Prime did not include MDI as an additional insured-vendor, or provide any "additional insured" coverage to

MDI, on the product liability policy in effect at the time the representation was made to Burlington.

**COUNT I**

20.    Burlington incorporates paragraphs 1 through 19 as though fully restated here.

21.    Based on its terms and provisions, the Policy provides no coverage for the underlying action, and thus Burlington has no duty to defend or indemnify any person or entity in connection with the underlying action.

22.    The Policy contains an endorsement (Sub-Manufacturers, Manufacturers, Assemblers and Suppliers Warranty/Guarantee Special Conditions) (the "Endorsement") which states:

> A.  The following condition is added to **Section IV – Conditions:**
>    You will obtain certificates of insurance from all sub-manufacturers, manufacturers, assemblers and suppliers that perform work or operations on your behalf and/or provide goods, products or materials to you. Such certificate shall provide evidence of:
>    1.  With respect to Commercial General Liability Coverage, limits of liability equal to or greater than the following limits for "bodily injury", "property damage" and "personal and advertising injury":
>        a.  $1,000,000 General Aggregate Limit
>        b.  $1,000,000 Products/Completed Operations Aggregate Limit
>        c.  $1,000,000 Each Occurrence Limit
>        d.  $1,000,000 Personal and Advertising Injury Limit
>    2.  With respect to Products/Completed Operations Liability Coverage, limits of liability equal to or greater than the following limits for "bodily injury" and "property damage":
>        a.  $1,000,000 Products/Completed Operations Aggregate Limit
>        b.  $1,000,000 Each Occurrence Limit; and
>    3.  You named as additional insured on each sub-manufacturer's, manufacturer's, assembler's or supplier's Commercial General Liability insurance policy and/or Products/Completed Operations Liability insurance policy.

> We will have no duty to defend nor will we be obligated to pay
> for any damages in any way related to or involving a sub-
> manufacturer, manufacturer, assembler or supplier who has
> worked, performed operations or provided products, goods or
> supplies to you if you fail to comply with this condition.

23.     MDI failed to comply with and breached the terms of the Endorsement because MDI did not obtain a certificate of insurance from Power Prime's products/completed operations liability insurance policy in effect on the date of the motorcycle accident.

24.     MDI additionally failed to comply with and breached the terms of the Endorsement because MDI was not named as an "additional insured" on Power Prime's products/completed operations liability insurance policy in effect on the date of the motorcycle accident.

25.     Because MDI failed to comply with and breached the terms of the Endorsement, the Policy provides no coverage for, and Burlington has no duty to defend or indemnify, any person or entity in connection with the underlying action.

## COUNT II (ALTERNATIVELY)

26.     Burlington incorporates paragraphs 1 through 25 as though fully restated here.

27.     MDI made material misrepresentations to Burlington and/or failed to correct false information given to Burlington on MDI's behalf regarding MDI obtaining certificates of product liability insurance from each of its manufacturers/suppliers and MDI being included as an additional insured-vendor under each manufacturers/suppliers' product liability insurance.

28.     MDI knew or should have known that its representations and/or the information provided to Burlington on MDI's behalf about it obtaining certificates of liability insurance and being included as an additional-insured vendor were false.

29.     MDI made the misrepresentations and/or failed to correct the false information with the intent that Burlington should accept and rely on the misrepresentations and/or false information referenced herein.

30.     Burlington relied on MDI's misrepresentations and/or the false information given to Burlington and/or MDI's failure to correct the information referenced herein.

31.     MDI has intentionally and/or innocently made misrepresentations and/or committed fraud actively and/or silently, in connection with procuring the Policy.

32.     Burlington suffered injury based on MDI's above-referenced conduct, because it issued MDI the Policy without having the opportunity to adequately ascertain and rate the risk and to determine whether Burlington would have issued the Policy in light of the potential risk.

33.     Burlington would not have issued the Policy as written and with the premium charged had MDI not made misrepresentations and/or committed fraud in its procurement.

34.     To the extent it may be required, Burlington hereby tenders to MDI the premium Burlington collected for the Policy.

35.     Burlington is entitled to rescind the Policy, such that it is void and provides no coverage for the underlying action and no duty to defend or indemnify any person or entity in connection with the underlying action.

## COUNT III

36.     Burlington incorporates paragraphs 1 through 35 as though fully restated here.

37.     Burlington is providing a defense to MDI in connection with the underlying action pursuant to a reservation of rights, which includes the right to seek a determination that no coverage is available, that Burlington may withdraw from providing a defense, and that Burlington may obtain reimbursement from MDI for all defense costs incurred.

38.     Since there is no insurance coverage available, Burlington owes no defense obligation to MDI, and Burlington is entitled to withdraw from providing MDI with a defense in the underlying action and to obtain from MDI all of Burlington's incurred defense costs from the underlying action.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff, The Burlington Insurance Company, prays that this Court (i) declare the rights and obligations of these parties under the insurance contract and determine that the Policy provides no coverage for, and Burlington has no duty to defend or indemnify, any person or entity in connection with the underlying action, (ii) alternatively, rescind the Policy and declare that the Policy is void and provides no coverage for any person or entity in connection with the underlying action, (iii) declare that Burlington may withdraw from providing MDI with a defense in the underlying action, (iv) enter judgment in favor of Burlington and against MDI for reimbursement of all defense costs incurred in the underlying action, and (v) award Burlington its attorneys' fees, costs and all other just and proper relief to which it is entitled.

Respectfully submitted,

FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, Arkansas 72202
(501) 374-0200 – Telephone

By: _____
Phil Campbell, Ark. Bar No. 81028
Annie Depper, Ark. Bar No. 2009267

ATTORNEYS FOR PLAINTIFF

# CERTIFIED POLICY

Attached is a true copy of policy number <u>HGL0038524</u> issued by <u>The Burlington Insurance Company</u> as indicated by its records available as of <u>8/18/16</u>.

Note that any issue date(s) reflected on this copy may reflect the dates we printed this certified copy and may not reflect the original issue date(s).

No representation or warranty is made that this copy is identical in all respects to the policy actually issued to the policyholder.

Signature: *William E. Patton*

Title: <u>Director, Product Management, The Burlington Insurance Company</u>

No insurance is afforded by this copy.

**EXHIBIT**

A

# INSURANCE POLICY

of

# The Burlington Insurance Company

A Stock Company

Home Office and Claim Office:
238 International Road
Burlington, North Carolina 27215
Tel. 336-586-2500 or
Toll Free 1-877-434-2667



**IFG Companies®**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representatives.

_____              _____
Secretary                                              Executive Vice President

IFG-I-0002 07 13

**COMMON POLICY DECLARATIONS**

**Policy Number**
HGL0038524

**Renewal of:**
HGL0034997

IFG Companies*

**THE BURLINGTON INSURANCE COMPANY**
Home Office: Burlington, North Carolina
Administrative Office: 100 Pearl Street, Hartford, CT 06103
Claims Office: 238 International Road, Burlington, NC 27215

**Item 1.** Named Insured and Mailing Address                                      Co. Use:LXM

Marshall Distributing, Inc.; Marshall Realty, LLC; 4162 Doerr Road, Inc.
P.O. Box 113
Cass City, MI 48726

Risk Placement Services, Inc.

8700 E Northsight Boulevard
Suite 100
Scottsdale, AZ 85260
Code:0671

**Item 2.** Policy Period          Effective Date: 06/06/14    Expiration Date: 06/06/15
at 12:01 A.M., Standard Time at your mailing address shown above.

**Item 3.** In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage.

| Coverage Part(s) | | Premium |
|---|---|---|
| Products-Completed Operations Liability | $ | 18,682 |
| | $ | |
| | $ | |
| | $ | |
| **Total Policy Premium or Deposit Premium** | $ | 18,682 |
| **Other Charges (if applicable)**     **Total Other Charges** | $ | |
| **Total Amount Due*** | $ | 18,682 |

*Premium is: ___ Flat   X  Auditable        Policy Minimum Premium   $   18,682
In the event you cancel this policy, we will retain a minimum premium. See IFG-I-0168.

**Item 4.** Forms and Endorsements applicable to this policy: See "Listing of Forms and Endorsements" (IFG-I-0150)

**Item 5.** Form of Business.    ___ Individual        ___ Partnership    ___ Joint Venture
___ Limited Liability Company   X Other Organization, including a Corporation
___ Trust

Business Description: Sporting Good, Athletic Equipment Distributor

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.

This insurance has been placed with an insurer that is not licensed by the state of Michigan. In case of insolvency, payment of claims may not be guaranteed.

Countersigned:
Date:                    By:
Issue Date: 08/18/2016                    Authorized Representative
IFG-I-0101 02 04          Certified          Page 1 of 1

POLICY NUMBER: HGL0038524

POLICY PERIOD:      06/06/2014                          06/06/2015
                    Effective Date                      Expiration Date

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# LISTING OF FORMS AND ENDORSEMENTS

This listing forms a part of the following:

## Products-Completed Operations Liability Policy

**NUMBER**                    **TITLE**

### Interline
IFG-I-0101 02 04 Common Policy Declarations (TBIC)
IFG-I-0152 09 09 Composite Rate Endorsement
IFG-I-0402 11 00 Service of Suit Amendment
IFG-I-0168 06 05 Minimum Earned Premium
IL 00 17 11 98 Common Policy Conditions
IL 00 21 09 08 Nuclear Energy Liability Exclusion

### Commercial Products/Completed Operations Liability
IFG-P-0005 03 08 Prod-Compl. Ops Declarations
CG 00 37 12 07 Prod-C.Ops Liab Coverage Form
BG-G-030 06 09 Limitation to Designated Products
CG 20 15 07 04 Additional Insured - Vendors
CG 21 33 11 85 Exclusion - Designated Products
IFG-G-0052 11 01 Deductible Liability Insurance
BG-G-004 07 10 Exclusion - Lead Substance
BG-G-007 07 10 Exclusion - Asbestos, Silica
CG 21 73 01 08 Excl - Cert Acts of Terrorism
CG 21 87 01 07 Conditional Exclusion of Terrorism
CG 21 98 12 07 Total Pollution Exclusion
CG 24 10 07 98 Excess Provision - Vendors
CG 31 31 12 04 Fungi or Bacteria Exclusion
CG 33 59 05 14 Excl - Confidential Info And Data
GSG-G-021 08 09 Excl - Intellectual Properties
IFG-G-0056 12 09 Special Conditions
IFG-G-0105 09 09  Exclusion - Professional Liability
IFG-G-0130 07 10 Exclusion - Violation of Law
GSG-P-021 08 99 Exclusion - New Entities

IFG-I-0150 03 03                                    Page  1 of 2

POLICY NUMBER: HGL0038524

POLICY PERIOD:          06/06/2014                    06/06/2015
                        Effective Date                Expiration Date

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LISTING OF FORMS AND ENDORSEMENTS

This listing forms a part of the following:

**Products-Completed Operations Liability Policy**

**NUMBER**                         **TITLE**

GSG-P-033 12 00 Exclusion - Aircraft, et.al.
IFG-P-0028 04 01 Exclusion - Cross Liability

**Cover Page**

IFG-I-0002 07 13 Policy Cover Page (TBIC)

POLICY NUMBER: HGL0038524                              EFFECTIVE DATE: 06/06/2014

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMPOSITE RATE ENDORSEMENT

**A. Adjustable premium.** The premium shown in the Schedule below is advance premium. The exposure shown in the Schedule is an estimate. Upon expiration of the policy, we will compute the earned premium by applying the composite rate shown below to the actual amount of the exposure as developed by final audit, subject to our retaining any applicable minimum earned premium.

The composite rate(s) shown below includes all of your business operations and premises unless they are specifically excluded from this policy or if charged and scheduled separately under the non-adjustable premium.

**B. Non-adjustable Premium.** If any portion of the Coverage Part Premium is shown as a Flat Premium on the Declarations Page for the applicable Coverage Part that portion of the premium is not subject to composite rate adjustment. However, Flat Premium is part of the Total Coverage Part Premium.

## Schedule

| **1. Coverage Part:  Products/Completed Operations** |
|---|
| The rate below applies to the following coverage: **Prod.Co.Ops Only** |
| Description<br>  Sporting Goods Distributor<br><br><br> |

| **Rating Basis:** | Your Estimated Exposure of Gross Sales is:<br>Rate (per $1,000 of Gross Sales) is:<br>Advanced Premium is: | $3,200,000<br>$5.8380<br>$18,682 |
|---|---|---|
| Audit is subject to ISO Com'l Lines Manual Rule 24 | | |

| **2. Coverage Part:** |
|---|
| The rate below applies to the following coverage: |
| Description<br><br><br><br> |

| **Rating Basis:** | Your Estimated Exposure of  is:<br>Rate (per  of ) is:<br>Advanced Premium is: |
|---|---|
| Audit is subject to ISO Com'l Lines Manual Rule 24 | |

| **3. Coverage Part:** |
|---|
| The rate below applies to the following coverage: |
| Description<br><br><br><br><br> |

| **Rating Basis:** | Your Estimated Exposure of  is:<br>Rate (per  of ) is:<br>Advanced Premium is: |
|---|---|
| Audit is subject to ISO Com'l Lines Manual Rule 24 | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT AMENDMENT

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the Statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, "suit" or proceeding instituted by or on behalf of the insured or any beneficiary hereunder rising out of this contract of insurance, and hereby designate the above named person as the person to whom the said officer is authorized to mail process or a true copy thereof.

It is further agreed that service of process in such "suit" may be made upon the President, or his nominee, of the Company at 238 International Road, Burlington, North Carolina 27215 and that in any "suit" instituted against any of them upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

It is agreed that in any state requiring a standard form of policy, insurance hereunder on values or properties in such state shall attach and cover in accordance with the terms and conditions of such standard form.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# MINIMUM PREMIUM

A minimum premium is the lowest amount to be retained as premium.   Minimum premium amounts ("Minimum Premium(s)") are itemized by coverage parts ("Coverage Part(s)"), the total of which is shown as the Policy Minimum Premium.    If the policy is auditable, the amount paid as an advance or deposit premium for the applicable Coverage Part(s) equals the Minimum Premium. The policy, whether auditable or non-auditable (flat), is subject to our retaining the Minimum Premium(s) as follows:

## A.  AUDITABLE POLICIES

Full Term:  We will retain one hundred percent (100%) of the Minimum Premium(s) for the Coverage Part(s). In addition, the results of an audit will determine if any additional premium over the Minimum Premium(s) for the Coverage Part(s) may be due.

Mid-Term Cancellations:  The results of an audit will determine if any additional premium over the Minimum Premium(s) for the Coverage Part(s) may be due. If no additional premium is due, the Minimum Premium(s) for the Coverage Part(s) will be retained as follows:

1.  If the first Named Insured or anyone with his, her, its or their power of attorney, including a premium finance company, cancels this policy or a Coverage Part:

   a.  Within ninety (90) days from the effective date:  We will retain twenty-five percent (25%) of the Minimum Premium(s) for the Coverage Part(s).

   b.  After ninety (90) days from the effective date: The Minimum Premium(s) for the Coverage Part(s) will be calculated based upon the number of days coverage was in effect.    Unless prohibited by law, your return premium will be reduced by applying a short rate penalty in the amount of ten percent (10%) to the unearned premium.

2.  If we cancel under the terms and conditions of this policy:

   a.  Within ninety (90) days from the effective date: We will retain twenty-five percent (25%) of the Minimum Premium(s) for the Coverage Part(s).

   b.  After ninety (90) days from the effective date: The Minimum Premium(s) for the Coverage Parts(s) will be calculated based upon the number of days coverage was in effect.  The unearned premium, or your return premium, will be calculated using a pro rata method of cancellation.   Unless prohibited by law, cancellation for non-payment of premium shall be deemed cancellation by the first Named Insured and your return premium will be reduced by applying a short rate penalty in the amount of ten percent (10%) to the unearned premium.

## B.  NON-AUDITABLE POLICIES (FLAT)

Full Term:  We will retain one hundred percent (100%) of the Minimum Premium(s) for the Coverage Part(s).

Mid-Term Cancellations:  If the policy or a Coverage Part is cancelled mid-term, the Minimum Premium(s) for the Coverage Part(s) will be retained in the same manner as set forth above in Sections 1 and 2 for Mid-Term Cancellations for Auditable Policies.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

         Copyright, Insurance Services Office, Inc., 1998            ☐

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

  COMMERCIAL AUTOMOBILE COVERAGE PART
  COMMERCIAL GENERAL LIABILITY COVERAGE PART
  FARM COVERAGE PART
  LIQUOR LIABILITY COVERAGE PART
  MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
  OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
  POLLUTION LIABILITY COVERAGE PART
  PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
  RAILROAD PROTECTIVE LIABILITY COVERAGE PART
  UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

        © ISO Properties, Inc., 2007           □

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**Policy Number:** HGL0038524

# PRODUCTS-COMPLETED OPERATIONS LIABILITY
## DECLARATIONS

| | | |
|---|---|---|
| **Named Insured:** | Marshall Distributing, Inc.; Marshall Realty, LLC; 4162 Doerr Road, Inc. | **Effective Date:** 06/06/2014 |

| | |
|---|---|
| **Item 1.** | LIMITS OF INSURANCE |

$ 2,000,000      Products-Completed Operations Aggregate Limit

$ 1,000,000      Each Occurrence Limit

Refer to individual policy forms and/or endorsements for various coverage sublimits, if applicable.

| | |
|---|---|
| **Item 2.** | AUDIT PERIOD (If Applicable) |

[X] Annually     [ ] Semi-Annually     [ ] Quarterly     [ ] Monthly

| | |
|---|---|
| **Item 3.** | FORM(S) AND ENDORSEMENT(S) made a part of this policy at time of issue: |

See Listing of Forms and Endorsements (IFG-I-0150)

| | |
|---|---|
| **Item 4.** | COMPOSITE RATE |

[X] If box is checked, see Composite Rate Endorsement (IFG-I-0152) for applicable classification, rates and premiums. If box is not checked, see page 2 of these Declarations for applicable classifications, rates and premiums.

| | |
|---|---|
| **Item 5.** | RETROACTIVE DATE (CG 00 38 only) |

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown here: None

| | |
|---|---|
| **Item 6** | PREMIUMS |

$   18,682      Total Coverage Part Advance Premium

$   18,682      Coverage Part Minimum Premium (if applicable)

These Declarations are part of the Policy Declarations containing the name of the insured and the policy period.

COMMERCIAL GENERAL LIABILITY
CG 00 37 12 07

# PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES
## PRODUCTS/COMPLETED OPERATIONS

### BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

  **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" included within the "products-completed operations hazard" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

    **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

  **b.** This insurance applies to "bodily injury" and "property damage" only if:

    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

    **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

  **c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

  **d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

    **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

    **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

    **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

 © ISO Properties, Inc., 2006 ☐

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

   © ISO Properties, Inc., 2006   **CG 00 37 12 07**   □

**g. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you; or

**(4)** Personal property in the care, custody or control of the insured.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

**h. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**i. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**j. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**k. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**l. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**SUPPLEMENTARY PAYMENTS**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**d.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**e.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© ISO Properties, Inc., 2006

**f.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverages – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

  © ISO Properties, Inc., 2006  CG 00 37 12 07

**2.** Each of the following is also an insured:

   **a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

     **(1)** "Bodily injury":

      **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

      **(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above;

      **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(a)** or **(b)** above; or

      **(d)** Arising out of his or her providing or failing to provide professional health care services.

     **(2)** "Property damage" to property:

      **(a)** Owned, occupied or used by,

      **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

     you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   **b.** Any person (other than your "employee") or any organization while acting as your real estate manager.

   **c.** Any person or organization having proper temporary custody of your property if you die, but only:

     **(1)** With respect to liability arising out of the maintenance or use of that property; and

     **(2)** Until your legal representative has been appointed.

   **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

   **b.** Coverage does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

### SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

**2.** The Aggregate Limit is the most we will pay for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**3.** Subject to Paragraph **2.** above, the Each Occurrence Limit is the most we will pay for damages because of all "bodily injury" and "property damage" arising out of any one "occurrence".

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

### SECTION IV – PRODUCTS/COMPLETED OPERATIONS LIABILITY CONDITIONS

**1. Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

 © ISO Properties, Inc., 2006

**2. Duties In The Event Of Occurrence, Claim Or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence".

b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

   This insurance is primary. Our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **b.** below.

b. **Method Of Sharing**

   If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

   If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

© ISO Properties, Inc., 2006
☐

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

2. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

3. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All other parts of the world if the injury or damage arises out of goods or products made or sold by you in the territory described in Paragraph a. above

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

4. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

5. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

6. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

7. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

 © ISO Properties, Inc., 2006

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection, architectural or engineering activities.

**8.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**9.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**10.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

© ISO Properties, Inc., 2006

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**11.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**12.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products/completed operations are included.

**13.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**14.** "Suit" means a civil proceeding in which damages because of "bodily injury" or "property damage" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**15.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**16.** "Your product":

**a.** Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

 © ISO Properties, Inc., 2006

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**17.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

© ISO Properties, Inc., 2006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION TO DESIGNATED PRODUCTS

This insurance modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

**Designated Products:**

GMAX & Zoan (Motorcycle, Snowmobile and ATV Helmets)

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to the "products-completed operations hazard", this insurance applies to "bodily injury" and "property damage" arising out of only "your products" specifically designated in the Schedule above.

                    Includes copyrighted material of
ISO Properties, Inc., with its permission.

POLICY NUMBER: HGL0038524 **COMMERCIAL GENERAL LIABILITY
CG 20 15 07 04**

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Products |
|---|---|
| Any vendor with whom you have agreed, in a written contract, that such vendor should be added as an additional insured on your policy, provided such written contract is fully executed prior to an "occurrence" in which coverage is sought under this policy. | Any of "your products" sold by the vendor. |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) (referred to below as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

**1.** The insurance afforded the vendor does not apply to:

**a.** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**b.** Any express warranty unauthorized by you;

**c.** Any physical or chemical change in the product made intentionally by the vendor;

**d.** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

**e.** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**f.** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**g.** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**h.** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

  **(1)** The exceptions contained in Sub-paragraphs **d.** or **f.;** or

  **(2)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**2.** This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

© ISO Properties, Inc., 2004

POLICY NUMBER: HGL0038524                         **COMMERCIAL GENERAL LIABILITY**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

#### SCHEDULE

**Designated Product(s):**

Any and all of "your products" that are made with, contain, emit or have a residue of cadmium.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

POLICY NUMBER: HGL0038524

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE LIABILITY INSURANCE
### DEDUCTIBLE APPLIES TO DAMAGES, DEFENSE COSTS AND SUPPLEMENTARY PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

| SCHEDULE | | | |
|---|---|---|---|
| **Coverage** | **Amount and Basis of Deductible** | | |
| | **PER CLAIM** | **or** | **PER OCCURRENCE OR OFFENSE** |
| Bodily Injury Liability<br>OR | $ | | $ |
| Property Damage Liability<br>OR | $ | | $ |
| Bodily Injury Liability and/or<br>Property Damage Liability Combined<br>OR | $ 5,000 | | $ |
| Personal and Advertising Injury Liability<br>OR | $ | | $ |
| Bodily Injury Liability,<br>Property Damage Liability and/or Personal and<br>Advertising Injury Liability Combined | $ | | $ |
| **Aggregate Deductible amount:** | $ | | |
| | (No aggregate deductible applies if left blank.) | | |

APPLICATION OF ENDORSEMENT (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all applicable coverages, however caused):

**A.** Our obligation under the Bodily Injury Liability, Property Damage Liability and Personal and Advertising Injury Liability Coverages to pay:

1. Damages on your behalf;

2. Defense Costs; and

3. Supplementary Payments

applies only to the amount in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

Our obligation to pay applies only to the difference between the deductible amounts shown above (less any amounts paid for Defense Costs or Supplementary Payments within the deductible amount, if applicable), and the limits of insurance stated in the policy.

**B.** You may select a deductible amount on either a per claim or a per "occurrence" or offense basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. Subject to paragraph **D.** below, the deductible amount stated in the Schedule above applies as follows:

1. **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury"; and, all Defense Costs or Supplementary Payments incurred by the company as a result

Contains copyright material with permission, Insurance Services Office, Inc. 1994

**a.** of a claim brought by any one person because of "bodily injury".

**b.** Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; and, all Defense Costs or Supplementary Payments incurred by the company as a result of a claim brought by any one person because of "property damage".

**c.** Under Personal and Advertising Injury Liability Coverage, to all damages sustained by any one person or organization because of "personal and advertising injury"; and, all Defense Costs or Supplementary Payments incurred by the company as a result of a claim brought by any one person because of "personal and advertising injury".

**d.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person, and Defense Costs or Supplementary Payments incurred by the company as a result of a claim brought by any one person because of:

**(1)** "Bodily injury";

**(2)** "Property damage"; or

**(3)** "Bodily injury" and "property damage" combined

**e.** Under Bodily Injury Liability, Property Damage Liability and/or Personal and Advertising Injury Liability Coverage Combined, to all damages sustained by any one person, and Defense Costs or Supplementary Payments incurred by the company as a result of a claim brought by any one person because of:

**(1)** "Bodily injury";

**(2)** "Property damage"; or

**(3)** "Personal and Advertising Injury";

**(4)** "Bodily injury", "property damage" and "personal and advertising injury" combined

as the result of any one "occurrence".

If damages are claimed for care, loss of services or death resulting at any one time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage" and "personal and advertising injury", person includes an organization.

**2. PER OCCURRENCE BASIS.** If the deductible amount indicated in the schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

**a.** Under Bodily Injury Liability Coverage, to all damages because of "bodily injury"; and, all Defense Costs or Supplementary Payments incurred by the company as a result of "bodily injury".

**b.** Under Property Damage Liability Coverage, to all damages because of "property damage"; and, all Defense Costs or Supplementary Payments incurred by the company as a result of "property damage".

**c.** Under Personal and Advertising Injury Liability Coverage, to all damages because of "personal and advertising injury"; and, all Defense Costs or Supplementary Payments incurred by the company as a result of "personal and advertising injury".

**d.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages, and Defense Costs or Supplementary Payments incurred by the company because of:

**(1)** "Bodily injury";

**(2)** "Property damage"; or

**(3)** "Bodily injury" and "property damage" combined

**e.** Under Bodily Injury Liability, Property Damage Liability and/or Personal and Advertising Injury Liability Coverage Combined, to all damages, and Defense Costs or Supplementary Payments incurred by the company because of:

**(1)** "Bodily injury";

**(2)** "Property damage"; or

**(3)** "Personal and Advertising Injury";

IFG-G-0052 1101          Contains copyright material with permission,          Page 2 of 3
Insurance Services Office, Inc. 1994

**(4)** "Bodily injury", "property damage" and "personal and advertising injury" combined

as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**C.** The Deductible amount applies to damages, Defense Costs and Supplementary Payments combined for any one Occurrence, Offense or Claim (whichever applies per paragraph **B.** above). The Deductible will be applied first to the payment of damages and then to the payment of Defense Costs and Supplementary Payments.

**D.** If an Aggregate Deductible amount is shown in the Schedule above, the total deductible amount you must pay during the policy period shall not exceed the amount of the Aggregate Deductible shown.

**E.** The terms of this insurance, including those with respect to:

**1.** Our right and duty to defend the insured against any "suits" seeking those damages,

**2.** Your duties in the event of an "occurrence", claim, or "suit" apply irrespective of the application of the deductible amount.

**F.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**G. DEFENSE COSTS DEFINITION – COVERAGES A AND B.**

For the purposes of this endorsement, Defense Costs includes attorney fees, court costs, interest and all other costs incurred by the company in the handling, investigation, and adjustment of claims or "suits" against the insured, even when no payment is made to the claimant, or when this insurance does not apply.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## EXCLUSION - LEAD BEARING SUBSTANCE

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
GARAGE COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraph **H.** of this endorsement is added to **2. Exclusions** of **Section I - Coverage A - Bodily Injury and Property Damage Liability** under the Commercial General Liability Coverage Form.

B. Paragraph **H.** of this endorsement is added to **2. Exclusions** of **Section I - Coverage B - Personal and Advertising Injury Liability** under the Commercial General Liability Coverage Form.

C. Paragraph **H.** of this endorsement is added to Paragraph **B. Exclusions** of **Section II – Liability Coverage** under the Garage Coverage Form.

D. When the Personal Injury Liability Coverage – Garages endorsement is attached, Paragraph **H.** of this endorsement is added to Paragraph **B.1. Exclusions** under the Personal Injury Liability Coverage – Garages endorsement.

E. When the Broadened Coverage – Garages endorsement is attached, Paragraph **H.** of this endorsement is added to Paragraph **B.1. Exclusions** of **Section I – Personal And Advertising Injury Liability Coverage** under the Broadened Coverage – Garages endorsement.

F. Paragraph **H.** of this endorsement is added to Paragraph **2. Exclusions** of **Section I - Coverages - Bodily Injury and Property Damage Liability** under the Owners And Contractors Protective Liability Coverage Form.

G. Paragraph **H.** of this endorsement is added to Paragraph **2. Exclusions** of **Section I - Coverages Products/Completed Operations - Bodily Injury and Property Damage Liability** under the Products/Completed Operations Liability Coverage Form.

H. This insurance does not apply to:

**Lead Bearing Substance**

"Any injury or damage" caused by plumbism (lead poisoning) or any disease or ailment caused by, or aggravated by exposure, consumption or absorption of lead, or due to or arising out of the actual or alleged presence of lead in any form, including the costs of remedial investigations or feasibility studies, or to the costs of testing, monitoring, cleaning or removal of any lead-bearing substance.

I. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes "bodily injury", "loss", "property damage", "personal and advertising injury", or "personal injury"  as defined in the applicable Coverage Part.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS, SILICA OR OTHER TOXIC SUBSTANCES

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
GARAGE COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **H.** of this endorsement is added to **2. Exclusions** of **Section I - Coverage A - Bodily Injury and Property Damage Liability** under the Commercial General Liability Coverage Form.

**B.** Paragraph **H.** of this endorsement is added to **2. Exclusions** of **Section I - Coverage B - Personal and Advertising Injury Liability** under the Commercial General Liability Coverage Form.

**C.** Paragraph **H.** of this endorsement is added to Paragraph **B. Exclusions** of **Section II – Liability Coverage** under the Garage Coverage Form.

**D.** When the Personal Injury Liability Coverage – Garages endorsement is attached, Paragraph **H.** of this endorsement is added to Paragraph **B.1. Exclusions** under the Personal Injury Liability Coverage – Garages endorsement.

**E.** When the Broadened Coverage – Garages endorsement is attached, Paragraph **H.** of this endorsement is added to Paragraph **B.1. Exclusions** of **Section I – Personal And Advertising Injury Liability Coverage** under the Broadened Coverage – Garages endorsement.

**F.** Paragraph **H.** of this endorsement is added to Paragraph **2. Exclusions** of **Section I - Coverages - Bodily Injury and Property Damage Liability** under the Owners And Contractors Protective Liability Coverage Form.

**G.** Paragraph **H.** of this endorsement is added to Paragraph **2. Exclusions** of **Section I - Coverages Products/Completed Operations - Bodily Injury and Property Damage Liability** under the Products/Completed Operations Liability Coverage Form.

**H.** This insurance does not apply to:

**Asbestos, Silica Or Other Toxic Substances**

"Any injury or damage" caused, in any manner, by asbestos, silica, asbestos dust or silica dust or any other similar fibrous or mineral substance in any form, whether or not it is incorporated into "your product or your work".

This insurance does not apply to any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat or in any way respond to, or assess the existence or effects of any such substance.

**I.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes "bodily injury", "loss", "property damage", "personal and advertising injury", or "personal injury" as defined in the applicable Coverage Part.

**2.** For the purposes of this endorsement, "your product or your work" means your product or work covered under any Coverage Part to which this endorsement is applicable, and includes "products", "work you performed", "your product", or "your work" as defined in the applicable Coverage Part.

Includes copyrighted material of
ISO Properties, Inc., with its permission.

COMMERCIAL GENERAL LIABILITY
CG 21 73 01 08

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   **a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   **b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

CG 21 73 01 08                    © ISO Properties, Inc., 2007                    **Page 1 of 1**     □

COMMERCIAL GENERAL LIABILITY
CG 21 87 01 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A. Applicability Of The Provisions Of This Endorsement**

1. The provisions of this endorsement become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.

   a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Part or Policy; or

   b. A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

      (1) Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

      (2) Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

      (3) Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

2. If the provisions of this endorsement become applicable, such provisions:

   a. Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to an incident(s) of terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and

   b. Remain applicable unless we notify you of changes in these provisions, in response to federal law.

 © ISO Properties, Inc., 2005  ☐

3. **If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.**

B. The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:

1. "Terrorism" means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      (1) Use or threat of force or violence; or

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. "Any injury or damage" means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or Policy.

C. The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ.

 © ISO Properties, Inc., 2005 CG 21 87 01 07   ☐

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs **C.5.** or **C.6.** are exceeded.

With respect to this Exclusion, Paragraphs **C.5.** and **C.6.** describe the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part or Policy.

In the event of any incident of "terrorism" that is not subject to this Exclusion, coverage does not apply to "any injury or damage" that is otherwise excluded under this Coverage Part or Policy.

© ISO Properties, Inc., 2005 ☐

COMMERCIAL GENERAL LIABILITY
CG 21 98 12 07

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of Section I **– Coverages – Bodily Injury And Property Damage Liability**

**2. Exclusions**

This insurance does not apply to:

**Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

The following definition is added to the Definitions Section:

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

© ISO Properties, Inc., 2006

COMMERCIAL GENERAL LIABILITY
CG 24 10 07 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCESS PROVISION – VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

When you are added to a manufacturer's or distributor's policy as an additional insured because you are a vendor for such manufacturer's or distributor's products, Paragraph **4., Other Insurance** of **Conditions (Section IV)** is amended by the addition of the following:

The coverage afforded the insured under this Coverage Part will be excess over any valid and collectible insurance available to the insured as an additional insured under a policy issued to a manufacturer or distributor for products manufactured, sold, handled or distributed.

Copyright, Insurance Services Office, Inc., 1997                   □

COMMERCIAL GENERAL LIABILITY
CG 31 31 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

© ISO Properties, Inc., 2003

**COMMERCIAL GENERAL LIABILITY**
**CG 33 59 05 14**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

Exclusion **2.l.** of **Section I – Coverages – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**l. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - INTELLECTUAL PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **D.** of this endorsement is added to **2. Exclusions** of **Section I - Coverage A - Bodily Injury and Property Damage Liability** under the Commercial General Liability Coverage Form.

**B.** Paragraph **D.** of this endorsement is added to **2, Exclusions** of **Section I - Coverage B - Personal and Advertising Injury Liability** under the Commercial General Liability Coverage Form.

**C. Paragraph D.** of this endorsement is added to **2. Exclusions** of **Section I - Coverage A - Bodily Injury and Property Damage Liability** under the Products/Completed Operations Liability Coverage Form.

**D.** This insurance does not apply to claims for "any injury or damage" that results from the actual or alleged infringement or violation of any intellectual property rights or laws, including but not limited to:

**1.** Copyright;
**2.** Patent;
**3.** Trade dress;
**4.** Trade name;
**5.** Trade secret; or
**6.** Trademark.

**G.** The following definition is added:

For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes "bodily injury", "property damage" or "personal and advertising injury" as defined in the applicable Coverage Part.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SUB-MANUFACTURERS, MANUFACTURERS, ASSEMBLERS AND SUPPLIERS WARRANTY/GUARANTEE SPECIAL CONDITIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following condition is added to **Section IV – Conditions**:

You will obtain certificates of insurance from all sub-manufacturers, manufacturers, assemblers and suppliers that perform work or operations on your behalf and/or provide goods, products or materials to you.  Such certificate shall provide evidence of:

**1.** With respect to Commercial General Liability Coverage, limits of liability equal to or greater than the following limits for "bodily injury", "property damage" and "personal and advertising injury":

   **a.** $1,000,000 General Aggregate Limit
   **b.** $1,000,000 Products/Completed Operations Aggregate Limit
   **c.** $1,000,000 Each Occurrence Limit
   **d.** $1,000,000 Personal and Advertising Injury Limit;

**2.** With respect to Products/Completed Operations Liability Coverage, limits of liability equal to or greater than the following limits for "bodily injury" and "property damage":

   **a.** $1,000,000 Products/Completed Operations Aggregate Limit
   **b.** $1,000,000 Each Occurrence Limit; and

**3.** You named as an additional insured on each sub-manufacturer's, manufacturer's, assembler's or supplier's Commercial General Liability insurance policy and/or Products/Completed Operations Liability insurance policy.

We will have no duty to defend nor will we be obligated to pay for any damages in any way related to or involving a sub-manufacturer, manufacturer, assembler or supplier who has worked, performed operations or provided products, goods or supplies to you if you fail to comply with this condition.

**B.** With respect to this endorsement, Paragraph **4. Other Insurance** of **Section IV – Conditions** is deleted and replaced by the following:

**4. Other Insurance**
   **a.** This insurance is excess over:
     **(1)** The Commercial General Liability coverage maintained by sub-manufacturers, manufacturers, assemblers and suppliers; and
     **(2)** The "products-completed operations hazard" coverage maintained by sub-manufacturers, manufacturers, assemblers and suppliers under a Commercial General Liability Coverage Part or a Products/Completed Operations Liability Coverage Part, whether such other insurance is primary, excess, contingent or any other basis.

   **b.** When this insurance is excess, we will have no duty under this policy to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit".  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

   **c.** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:
     **(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
     **(2)** The total amount of all deductible and self-insured amounts under all that other insurance.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **C.** of this endorsement is added to **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and to **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability** under Commercial General Liability Coverage Form.

**B.** Paragraph **C.** of this endorsement is added to **2. Exclusions** of **Section I – Coverages - Bodily Injury And Property Damage Liability** under Products/Completed Operations Liability Coverage Form.

**C.** This insurance does not apply to "any injury or damage" arising out of the rendering of or failure to render any professional services by or for you.

**D.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes "bodily injury", "property damage" or "personal and advertising injury" as defined in the applicable Coverage Part.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS AND COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **C.** of this endorsement is added to Paragraph **2. Exclusions** of **Section I - Coverages - Bodily Injury and Property Damage Liability** under the Owners And Contractors Protective Liability Coverage Form.

**B.** Paragraph **C.** of this endorsement is added to Paragraph **2. Exclusions** of **Section I - Coverages Products/Competed Operations - Bodily Injury and Property Damage Liability** under the Products/Completed Operations Liability Coverage Form.

**C.** This insurance does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly of indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EXCLUSION - NEW ENTITIES**

This endorsement modifies insurance provided under the following:

PRODUCTS/COMPLETED OPERATIONS COVERAGE FORM

Paragraph 3. of WHO IS AN INSURED (Section II) does not apply.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

GSG P 021 0899

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EXCLUSION – AIRCRAFT PRODUCTS AND GROUNDING**

This endorsement modified insurance provided under the following:

PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard" and arising out of any "aircraft product" or the "grounding" of any aircraft.

"Aircraft product" means:

1. Aircraft (including missile or spacecraft, and any ground support or control equipment used therewith); and

2. Any article furnished by the insured and installed in an aircraft or used in connection with an aircraft, or for spare parts for an aircraft, including ground handling tools and equipment; and

3. Any of "your products" used at an airport for the purpose of guidance, navigation or direction of aircraft; and

4. Training aids, manuals, blueprints, engineering or other data or advice, and services and labor relating to such aircraft, articles or products.

"Grounding" means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft, by reason of the existence of or alleged or suspected existence of any defect, fault or condition in such aircraft or any part therefore sold, handled or distributed by the insured or manufactured, assembled or processed by any other person or organization according to specifications, plans, suggestions, orders, or drawings of the insured or with tools, machinery or other equipment furnished to such persons or organizations by the insured, whether such aircraft so withdrawn are owned or operated by the same or different persons, organizations or corporations.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

GSG-P-033 1200

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EXCLUSION - CROSS LIABILITY**

This endorsement modifies insurance under the following:

PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

This insurance does not apply to any actual or alleged "bodily injury" or "property damage" to:

1. Any business enterprise in which any insured owns an interest, is a partner, or which is a parent, affiliate, subsidiary or sister company of any insured;
2. Any business enterprise directly or indirectly controlled, operated or managed by a business enterprise described in **1** above;
3. A present, former, future or prospective partner, officer, director, stockholder or employee of any insured;
4. Any insured; or
5. The spouse child, parent or sibling of any of the above as a consequence of **1, 2, 3** or **4** above.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

IFG-P-0028 0401

BURLINGTON INSURANCE COMPANY
238 INTERNATIONAL ROAD
BURLINGTON NC 27215

## NOTICE OF NONRENEWAL OF INSURANCE

Named Insured & Mailing Address:

MARSHALL DISTRIBUTING, INC.; MARSHALL
REALTY, LLC; 4162 DOERR ROAD, INC.
P.O. BOX 113
CASS CITY MI 48726

Producer: 0671

RISK PLACEMENT SERVICES, INC.
8700 E NORTHSIGHT BOULEVARD
SUITE 100
SCOTTSDALE AZ 85260

Policy No.:  HGL0038524
Type of Policy:  PRODUCTS LIABILITY-OCCURRENCE
Date of Expiration:  06/06/2015; 12:01 A.M. Local Time at the mailing address of the Named Insured.

We will not renew this policy when it expires.  Your insurance will cease on the Expiration Date shown above.

The reason for nonrenewal is  Loss History

# Home Office Copy

Named Insured

MARSHALL DISTRIBUTING, INC.; MARSHALL
REALTY, LLC; 4162 DOERR ROAD, INC.
P.O. BOX 113
CASS CITY MI 48726

Date Mailed:
13th day of April, 2015

_____
AUTHORIZED REPRESENTATIVE

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**ROBERT HASKETT AND LAURA HASKETT**                    **PLAINTIFFS**

**V.**                    **NO. 3:16-cv-00047 BSM**

**T.N.H.D. PARTNERS, LLC d/b/a HARLEY DAVIDSON**
**OF COOL SPRINGS; 4162 DOERR ROAD, INC.**
**D/B/A MARSHALL DISTRIBUTING, INC.;**
**POWER PRIME LIMITED; and JOHN DOE 1,**
**UNKNOWN DEFENDANT**                    **DEFENDANTS**

### SECOND AMENDED COMPLAINT

Come now Plaintiffs, Robert Haskett and Laura Haskett, by and through

their attorneys, and, pursuant to Fed R. Civ. P. 15, submit this Second Amended

Complaint against Defendants and allege as follows:

### PARTIES

1.    Robert Haskett is a resident of the State of Arkansas, residing at 47

Shoemaker Circle, Conway, Faulkner County, Arkansas 72032.  During all of the

relevant time period, Robert Haskett was married to Laura Haskett.

2.    Laura Haskett is a resident of the State of Arkansas, residing at 47

Shoemaker Circle, Conway, Faulkner County, Arkansas 72032.  During all of the

relevant time period, Laura Haskett was married to Robert Haskett, and was an

able-bodied female, who was gainfully employed by the University of Arkansas

1



for Medical Sciences, earning a livelihood for herself and contributing to her family.

3.      Defendant T.N.H.D. Partners, LLC, a limited liability company, filed with the Tennessee Secretary of State on February 2, 2016, the assumed name Harley Davidson of Cool Springs.   Upon information and belief, Defendant T.N.H.D. Partners, LLC operated under the assumed name Harley Davidson of Cool Springs as early as June 10, 2010 and during the time in question herein. T.N.H.D. Partners, LLC's principal place of business is 6015 Airline Drive, Metairie, Louisiana   70003-4330.   Plaintiffs believe that on July 21, 2014, T.N.H.D. Partners, LLC, operating as Harley-Davidson of Cool Springs, operated the Harley Davidson shop in Franklin, Tennessee, where Plaintiffs stopped for service to Robert Haskett's Harley Davidson motorcycle.

Upon information and belief, T.N.H.D. Partners, LLC d/b/a Harley-Davidson of Cool Springs is not authorized to do business in Arkansas and has no registered agent for service of process in Arkansas. However, T.N.H.D. Partners, LLC actively advertises and markets in the state of Arkansas by way of emails and telephone calls to residents of Arkansas, including Robert Haskett, in order to increase and attract business from Arkansas residents.   In addition, T.N.H.D. Partners, LLC maintains an interactive website through which it advertises all of its motorcycle inventory, along with the prices of many of the cycles, and invites

those who view the website to message or call the dealership to inquire about purchase of the motorcycle.   T.N.H.D. Partners, LLC has obtained business from Arkansas residents through its many marketing efforts, including motorcycle and parts sales and service. Under the Rules of Civil Procedure, service of process may be made upon T.N.H.D. Partners, LLC d/b/a Harley-Davidson of Cool Springs by service on the registered agents, Michael Greg Cooke and Jeanette Phelps, 2410 Hidden River Lane, Franklin, Tennessee  37069-6902.

4.      Defendant 4162 Doerr Road, Inc. is a Michigan corporation that operates or operated under the assumed name Marshall Distributing, Inc.   Upon information and belief, Defendant Western Power Sports, Inc. acquired all or a portion of Defendant 4162 Doerr Road, Inc.'s operations as Marshall Distributing, Inc. ("MDI") through a merger that began in November 2014 and was completed in the spring of 2015.   Upon information and belief, Defendant 4162 Doerr Road, Inc. was a distributor of ZOAN helmets at the time that Drasco Trading Post, Drasco, Arkansas sold to Robert Haskett the ZOAN Route 66 model worn by Laura Haskett during the motorcycle accident that occurred on July 21, 2014 and resulted in the injuries set forth herein. Upon information and belief, 4162 Doerr Road, Inc. is not authorized to do business in Arkansas and has no registered agent for service of process in Arkansas. Under the Rules of Civil Procedure, service of process may

be made upon 4162 Doerr Road, Inc. by service on its registered agent, Kathryn A. Sims, 4971 Glen Oaks Drive NE, Rockford, MI 49341.

5. Defendant Power Prime Limited is a corporation registered and with its principal place of business in Hong Kong. Power Prime Limited owns the United States trademark for ZOAN, the brand of motorcycle helmet sold to Robert Haskett and worn by Laura Haskett during the motorcycle accident that occurred on July 21, 2014 and resulted in the injuries set forth herein. Upon information and belief, Power Prime Limited designs, manufactures and sells the ZOAN brand of parts, accessories, helmets, and apparel, including ZOAN motorcycle helmets. Power Prime Limited is not authorized to do business in Arkansas and has no registered agent for service of process in Arkansas or in the United States, despite its U.S. trademark. Under the Rules of Civil Procedure, service of process may be made upon Power Prime Limited by service on its owner or other high-ranking officer. Upon information and belief, John Jack Ramsay is an owner of Power Prime Limited and may be served at his address 13 Tobin Court, London, Ontario. Power Prime Limited may also be served at its principal address, 3201-02, Alexandra House, 18 Chater Rd., Central Hong Kong.

6. Defendant John Doe 1 is an entity and/or person directly or vicariously liable for Plaintiffs' injuries. Plaintiffs are currently unable to identify this Unknown Defendant, despite diligent efforts, but may discover such identities

4

upon further investigation.  Said Defendant is named pursuant to Ark. Code Ann.

§16-56-125, as their acts and omissions were negligent, tortious or otherwise

wrongful with respect to the injuries of Plaintiffs. See Affidavit attached hereto as

**Exhibit A.**

## JURISDICTION AND VENUE

7.     Plaintiffs incorporate all of the allegations contained in Paragraphs 1 –

6.

8.     This Court has jurisdiction over the parties and the subject matter

pursuant to 28 U.S.C.A. § 1332 because the matter in controversy exceeds the sum

or value of $75,000.00, exclusive of interest and costs, and is between citizens of

different States and in which citizens or subjects of a foreign state are additional

parties.

9.     A substantial part of the events or omissions giving rise to the claims

alleged herein occurred in Drasco, Cleburne County, Arkansas.   Accordingly,

venue is proper in this Court pursuant to 28 U.S.C.A. § 1391.

## FACTS

10.    Plaintiffs incorporate all of the allegations contained in Paragraphs 1 -

9.

11.    On or about July 5, 2014, Robert Haskett purchased a ZOAN Route

66 model helmet at Drasco Trading Post, Drasco, Arkansas.   Robert Haskett

purchased the helmet for his wife Laura to wear on a motorcycle trip that they were planning to take to Ohio on Robert Haskett's 2007 Harley Davidson in the coming weeks. Upon information and belief, the helmet was distributed by 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. Upon further information and belief, the ZOAN Route 66 model helmet was designed and manufactured by Prime Power Limited.

12.     On July 16, 2014, Robert Haskett and Laura Haskett commenced their trip to Ohio on Robert Haskett's 2007 Harley Davidson. At all times, Robert Haskett drove the motorcycle and Laura Haskett was a passenger on the motorcycle.

13.     On July 21, 2014, during the drive home from Ohio, Robert Haskett noticed that his back tire was running low. Just before noon, Robert and Laura Haskett stopped at a Harley Davidson shop in Franklin, Tennessee called Harley-Davidson of Cool Springs. Harley-Davidson of Cool Springs charged Robert Haskett for, and represented to Mr. Haskett that they had replaced, the rear tire, and installed a new rim band and a new tube, as well as new rear brake pads. In connection with, and at the time of T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs' service on Mr. Haskett's motorcycle, T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs requested and obtained Robert Haskett's personal information, including his email and telephone number, for purposes of

6

continued solicitation of his business. Harley-Davidson of Cool Springs knew that Robert Haskett lived in Conway, Arkansas, and that he was, at that time, en route back to Arkansas when he stopped at the shop for repairs and replacement parts. Harley-Davidson of Cool Springs charged Robert Haskett $486.19 for its services. See Invoice attached hereto as **Exhibit B**.   T.N.H.D. Partners, LLC d/b/a Harley-Davidson of Cool Springs' has utilized the information it obtained at the time of sale to send to Robert Haskett more than 70 personalized emails soliciting his ongoing business at Harley Davidson of Cool Springs, sending Mr Haskett up to 11 emails a month during some months.   T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs continues to solicit Mr. Haskett's business through emails and telephone calls directed to Mr. Haskett in Arkansas, all as a result of and in connection with the information they solicited and obtained at the time of the tire sale in question.   T.N.H.D. Partners, LLC's owner, Robert Rubin has testified that the voice messages and emails are marketing measures directed at bringing in customers to the store and increase sales, whether those customers are from Tennessee, Arkansas, or any other surrounding state.

14.    At approximately 2:50 p.m. on July 21, 2014, about 120 miles outside of Nashville, another cyclist traveling with the Hasketts told the Hasketts that their rear tire looked low.  As Robert Haskett slowed down and attempted to pull off the road to inspect the tire, it blew out, causing Robert Haskett to lose control of the

motorcycle, and throwing Laura Haskett off of the motorcycle into the guardrail. Laura Haskett was air lifted to the Regional Medical Center in Memphis, Tennessee with severe head trauma, including a .5 to 2.5 cm jagged laceration to her scalp and nondisplaced fracture extending through right occipital skull to right skull base, right-sided extra-axial hemorrhage, hemorrhagic contusion involving inferior aspects of both frontal lobes, and mild 3mm right to left midline shift. Laura Haskett was wearing the ZOAN Route 66 helmet at the time of the crash. However, the helmet's design was deficient, causing the strap to tear away from the helmet, and resulting in severe injuries to Laura Haskett's skull.

15.    Each of the Plaintiffs sustained injuries including, but not limited to:

(a)    Robert Haskett suffered injuries including, but not limited to cracked ribs, bruising, abrasions, muscle stiffness and loss of consortium.

(b)    Laura Haskett suffered incapacitating injuries including, but not limited to, a traumatic brain hemorrhage and closed skull fracture, specifically, a right occipital skull fracture extending through mastoid air cells and middle ear with associated hemorrhage in external auditory canal and middle ear.  She had to be transported by air evac from the scene of the collision to the Regional Medical Center in Memphis, Tennessee.  Although she was physically active and in good health before sustaining the traumatic brain injury, Laura Haskett remains unable to return to work since the collision due to severe memory and cognitive deficits.

Additionally, Laura Haskett's damages include severe pain, which has impeded her ability to engage in the normal activities of life.  Laura Haskett's damages further include disability, past and future emotional distress, past and future pain and suffering, past and future loss of capacity for the enjoyment of life, loss of earnings, loss of ability to earn money in the future, as well as past and future medical expenses.  These damages are either permanent or continuing, and she will suffer additional injuries in the future.

16.     Upon information and belief, the full course and extent of the injuries each of the Plaintiffs has suffered is of a continuing nature, the full extent of which remains unknown at this time.  Plaintiffs reserve the right to amend their pleadings as the full course and extent of their injuries become known.

## COUNT I

## STRICT LIABILITY CLAIMS AGAINST PRIME POWER LIMITED, 4162 DOERR ROAD, INC. D/B/A MARSHALL DISTRIBUTING, INC.,  AND JOHN DOE DEFENDANT-DEFECTIVE DESIGN

17.     Plaintiffs incorporate all of the allegations contained in Paragraphs 1 - 16.

18.     Plaintiffs bring this action against Power Prime Limited, 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc., and John Doe Defendant pursuant to the Arkansas Product Liability Act of 1979 (Ark. Code Ann. §16-116-101 et seq.).

19.    Defendant Power Prime Limited was engaged in the business of designing, manufacturing and selling the ZOAN Route 66 helmet at issue in this matter.

20.    Defendant Power Prime Limited made the ZOAN Route 66 helmet available for sale in the United States through its distributor, 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.

21.    Defendant 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. controlled the distribution and sale of all ZOAN helmets in the United States, including the ZOAN Route 66 helmet at issue in this matter.

22.    Defendant Power Prime Limited designed the ZOAN Route 66 helmet in a defective condition in that the helmet was unsafe for its intended use. Specifically, the neck strap was designed and manufactured in such a way that upon impact with the pavement, it ripped off of the helmet, subjecting the wearer to substantial cranial injuries.

23.    Defendant 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. distributed the ZOAN Route 66 helmet to Drasco Trading Post in a defective condition in that the helmet's design was unsafe for its intended use. Specifically, the neck strap was designed in such a way that upon impact with the pavement, it ripped off of the helmet, subjecting the wearer to substantial cranial injuries.

24.     On or about July 5, 2014, Robert Haskett purchased the ZOAN Route 66 helmet for his wife Laura to wear on their motorcycle trip to Ohio.

25.     On July 21, 2014, Laura Haskett suffered severe and permanent injuries to her head while wearing the ZOAN Route 66 helmet, which failed when the neck strap ripped off of the helmet upon impact with the pavement.  Plaintiff Laura Haskett was and is in the class of persons that Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. should have considered to be subject to the harm caused by the defective nature of the helmet.

26.     The helmet was used in the manner for which it was intended.  This use proximately resulted in the injuries Plaintiffs sustained.

27.     Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.  knew or should have known through testing, adverse event reporting, or otherwise, that the helmet's retention system, including the chin strap, was defectively designed, creating a high risk of bodily injury and harm to those wearing the helmet during a motorcycle collision due to the propensity of the retention system to separate from the helmet under foreseeable collision circumstances.

28.     Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.'s failure to adequately warn and instruct regarding the

risk and severity of adverse events created by the helmet's defective retention system was both a but-for and proximate cause of Laura Haskett's injuries.

29.     As a direct and proximate result of Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.'s grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiff Laura Haskett asserts a claim for judgment for all compensatory and punitive damages against Defendants Power Prime Limited, 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc., and John Doe Defendant, including, but not limited to, the physical injuries described herein, pain and suffering, mental anguish, disability, medical expenses, caretaking and custodial care, including any such damages reasonably certain to be incurred in the future, in an amount to be determined by the jury, plus the costs of this litigation, and all of the relief to which Plaintiffs are entitled to by law, all in an amount in excess of that necessary for federal diversity jurisdiction.

## COUNT II

## STRICT LIABILITY CLAIMS AGAINST POWER PRIME LIMITED, 4162 DOERR ROAD, INC. D/B/A MARSHALL DISTRIBUTING, INC., AND JOHN DOE DEFENDANT-MANUFACTURING DEFECT

30.     Plaintiff incorporates all allegations contained in Paragraphs 1 - 16.

31.     Plaintiffs bring this action against Power Prime Limited, 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc., and John Doe Defendant pursuant to the Arkansas Product Liability Act of 1979 (Ark. Code Ann. §16-116-101 et seq.).

32.     The ZOAN Route 66 helmet is defectively manufactured because the risk of foreseeable risks of malfunction and failure under foreseeable collision circumstances outweigh the benefits associated with the helmet.

33.     The ZOAN Route 66 helmet was purchased by Robert Haskett and utilized by Laura Haskett without substantial change or adjustment to its component parts.

34.     Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc., had reason to know of the defects and deficiency in the manufacture of the helmet.  Defendants Power Prime Limited, and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. also had reason to know about the associated risk of serious bodily injury or death to wearers of the helmet due to defects in the retention system under foreseeable collision circumstances which are included in its intended use.  These risks went beyond the risks that an ordinary manufacturer of motorcycle helmets would assume was a reasonable risk of harm from use.

35.     Wearing the ZOAN Route 66 helmet under foreseeable collision circumstances is inherently dangerous due to its defective manufacture.

13

36.    Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.'s defective manufacture and distribution of the defective ZOAN Route 66 helmet was both a but-for and proximate cause of Laura Haskett's injuries.

37.    As a direct and proximate result of Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.'s grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiff Laura Haskett asserts a claim for judgment for all compensatory and punitive damages against Defendants Power Prime Limited, 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc., and John Doe Defendant including, but not limited to, the physical injuries described herein, pain and suffering, mental anguish, disability, medical expenses, caretaking and custodial care, including any such damages reasonably certain to be incurred in the future, in an amount to be determined by the jury, plus the costs of this litigation, and all of the relief to which the Plaintiffs are entitled to by law, all in an amount in excess of that necessary for federal diversity jurisdiction.

## COUNT III

## NEGLIGENCE CLAIMS AGAINST POWER PRIME LIMITED, 4162 DOERR ROAD, INC. D/B/A MARSHALL DISTRIBUTING, INC., AND JOHN DOE DEFENDANT

38.    Plaintiffs incorporate all allegations contained in Paragraphs 1 - 37.

14

39.     Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. had a duty to use ordinary care in their design, manufacture and distribution of the ZOAN Route 66 helmet in order to protect those who would use the helmet, such as Laura Haskett, from unreasonable risk of harm while the helmet was being worn for its intended purpose or while it is being used for any purpose which should be reasonably expected by the manufacturer.

40.     Defendant Power Prime Limited had a duty to use ordinary care in the selection of materials used in its manufacture of the ZOAN Route 66 helmet in order to protect those who would wear the helmet, such as Laura Haskett, from unreasonable risk of harm while the helmet was being worn for its intended purpose or while it is being used for any purpose which should be reasonably expected by the manufacturer.

41.     Defendant Power Prime Limited had a duty to use ordinary care in its manufacture of the ZOAN Route 66 helmet in order to protect those who would wear the helmet, such as Laura Haskett, from unreasonable risk of harm while the helmet was being worn for its intended purpose or while it is being used for any purpose which should be reasonably expected by the manufacturer.

42.     Defendant Power Prime Limited had a duty to use ordinary care in its inspection and testing of the ZOAN Route 66 helmet in order to protect those who would wear the helmet, such as Laura Haskett, from unreasonable risk of harm

while the helmet was being worn for its intended purpose or while it is being used for any purpose which should be reasonably expected by the manufacturer.

43.   Defendant Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. had a duty to give reasonable and adequate warning of dangers inherent in the use of the ZOAN Route 66 helmet which the manufacturer and distributor should reasonably foresee but which are not obvious to ordinary consumers.

44.   Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. breached these duties by failing to provide Drasco Trading Post for sale to Robert Haskett and Laura Haskett a safe ZOAN Route 66 helmet with adequate warnings.

45.   A reasonably careful manufacturer and distributor of helmets using the skill and care ordinarily possessed and used by similar manufacturers and distributors would foresee that the failure to provide the ordinary care listed above would result in devastating injuries to others, including Laura Haskett.

46.   Each of the foregoing acts of negligence on the part of Defendants Power Prime Limited and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc. was a proximate cause of Laura Haskett's injuries, as more specifically described above, which were all foreseeable.

47.     As a direct and proximate result of Defendants Power Prime Limited

and 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.'s grossly negligent,

willful, wanton, reckless, malicious and/or intentional conduct, Plaintiff Laura

Haskett asserts a claim for judgment for all compensatory and punitive damages

against Defendants Power Prime Limited, 4162 Doerr Road, Inc. d/b/a Marshall

Distributing, Inc., and John Doe Defendant, including but not limited to, the

physical injuries described herein, pain and suffering, mental anguish, disability,

medical expenses, caretaking and custodial care, including any such damages

reasonably certain to be incurred in the future, in an amount to be determined by

the jury, plus the costs of this litigation, and all of the relief to which the Plaintiffs

are entitled to by law, all in an amount in excess of that necessary for federal

diversity jurisdiction.

## COUNT IV

## NEGLIGENCE OF T.N.H.D. PARTNERS, LLC d/b/a HARLEY-DAVIDSON OF COOL SPRINGS AND JOHN DOE DEFENDANT

48.     Plaintiffs incorporate all of the allegations contained in Paragraphs 1 -

16.

49.     On July 21, 2014, Robert and Laura Haskett stopped at a Harley

Davidson shop in Franklin, Tennessee called Harley-Davidson of Cool Springs to

replace the rear tire, rim band and tube on Robert Haskett's Harley Davidson

because the rear tire had been running low.

50.     Upon information and belief, T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs, operated Harley-Davidson of Cool Springs on July 21, 2014.

51.     In connection with, and at the time of Harley-Davidson of Cool Springs' service on Mr. Haskett's motorcycle, T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs requested and obtained Robert Haskett's personal information, including his email and telephone number, for purposes of continued solicitation of his business.

52.     T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs charged Robert Haskett for, and represented to Mr. Haskett that they had replaced, the rear tire, and installed a new rim band and a new tube, as well as new rear brake pads.

53.     T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs knew that Robert Haskett lived in Conway, Arkansas, and that he was, at that time, en route back to Arkansas when he stopped at the shop for repairs and replacement parts.  T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs charged Robert Haskett $486.19 for its services.  See Invoice attached hereto as **Exhibit B.**

54.     At approximately 2:50 p.m. on July 21, 2014, about 120 miles outside of Nashville, another cyclist traveling with the Hasketts told the Hasketts that their rear tire looked low.  As Robert Haskett slowed down and attempted to pull off the

road to inspect the tire, it blew out, causing Robert Haskett to lose control of the motorcycle, and throwing Laura Haskett off of the motorcycle into the guardrail. Laura Haskett was air lifted to the Regional Medical Center in Memphis, Tennessee with severe head trauma, including a .5 to 2.5 cm jagged laceration to her scalp and nondisplaced fracture extending through right occipital skull to right skull base, right-sided extra-axial hemorrhage, hemorrhagic contusion involving inferior aspects of both frontal lobes, and mild 3mm right to left midline shift. Laura Haskett was wearing the ZOAN helmet at the time of the crash.  However, the helmet's design was deficient, causing the strap to tear away from the helmet, and resulting in severe injuries to Laura Haskett's skull.

55.    Robert Haskett and Laura Haskett had no reason to believe that T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs did not replace the rear tire, rim band and tube, with new parts.   To the contrary, T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs specifically charged Robert Haskett for a new rear tire, rim band and tube.

56.    Following the collision, Plaintiffs employed an expert to examine Robert Haskett's Harley Davidson to determine the cause of the tire failure.  It was not until the expert's report November 18, 2015, that Plaintiffs first learned that the rim band that T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs utilized on the rear tire was a used band.

57.   At no point prior to the expert's November 18, 2015 report did Plaintiff have any reason to believe that T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs had utilized a used rim band on Robert Haskett's rear tire, as T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs specifically charged Robert Haskett for a new band.

58.   As reflected by the invoice attached as Exhibit B, T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs concealed their installation of the used rim band on the rear tire by charging Robert Haskett for a new band and by representing to him that the rim band had been replaced with a new rim band.

59.   Plaintiff could not know about T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs' negligent use of a used rim band until Plaintiff's expert's November 18, 2015 report.  As such, Plaintiff's claims against T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs are timely filed.

60.   T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs had a duty to use ordinary care in its installation of the tire, rim band and tube on Robert Haskett's rear tire.

61.   T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs breached its duties by failing to provide Robert Haskett with a properly installed new tire, rim band and tube.

62.   A reasonably careful motorcycle service center using the skill and care ordinarily possessed and used by similar motorcycle service centers would foresee that the failure to install a new rim band with the new tire and tube and to provide the ordinary care listed above would result in devastating injuries to others, including Robert and Laura Haskett.

63.   T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs' failure to provide Robert Haskett with a properly installed new rim band proximately caused the tire failure on July 21, 2014.

64.   Indeed, it was the used rim band's failure that directly contributed to the failure of the new rear tire.

65.   Each of the foregoing acts of negligence on the part of T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs was a proximate cause of Robert and Laura Haskett's injuries, as more specifically described above, which were all foreseeable.

66.   As a direct and proximate result of T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs' grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiffs Robert and Laura Haskett assert a claim for judgment for all compensatory and punitive damages against Defendant T.N.H.D. Partners, LLC, d/b/a  Harley-Davidson of Cool Springs and John  Doe Defendant, including but not limited to, the physical injuries described herein, pain

and suffering, mental anguish, Laura Haskett's disability, medical expenses, Laura

Haskett's caretaking and custodial care, including any such damages reasonably

certain to be incurred in the future, in an amount to be determined by the jury, plus

the costs of this litigation, and all of the relief to which the Plaintiffs are entitled to

by law, all in an amount in excess of that necessary for federal diversity

jurisdiction.

## COUNT V

## FRAUD OF T.N.H.D. PARTNERS, LLC, d/b/a HARLEY-DAVIDSON OF COOL SPRINGS AND JOHN DOE DEFENDANT

67.     Plaintiffs reallege Paragraphs 1–16 and 49-66 as if fully set forth

herein.

68.     On July 21, 2014, Robert and Laura Haskett stopped at a Harley

Davidson shop in Franklin, Tennessee called Harley-Davidson of Cool Springs to

replace the rear tire, rim band and tube on Robert Haskett's Harley Davidson

because the rear tire had been running low.

69.     T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs

charged Robert Haskett for, and represented to Mr. Haskett that they had replaced,

the rear tire, and installed a new rim band and a new tube, as well as new rear

brake pads.

70.     Robert Haskett and Laura Haskett had no reason to believe that

T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs did not replace

22

the rear tire, rim band and tube, with new parts.   To the contrary, T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs specifically charged Robert Haskett for a new rear tire, rim band and tube. See invoice attached hereto as **Exhibit B**.

71.   Following the collision, Plaintiffs employed an expert to examine Robert Haskett's Harley Davidson to determine the cause of the tire failure.  It was not until the expert's report November 18, 2015, that Plaintiffs first learned that the rim band that T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs utilized on the rear tire was a used rim band.

72.   At no point prior to the expert's November 18, 2015 report did Plaintiff have any reason to believe that T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs had utilized a used rim band on Robert Haskett's rear tire, as T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs specifically charged Robert Haskett for a new rim band.

73.   As reflected by the invoice attached as Exhibit B, T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs concealed their installation of the used rim band on the rear tire by charging Robert Haskett for a new band and by representing to him that the rim band had been replaced with a new rim band.

74.   T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs knew that the rim band used on Robert Haskett's motorcycle was, in fact, a used rim band.

75.    T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs knew that its representations of the rim band's condition were false.

76.    T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs had the intent to induce Plaintiffs to replace their rear tire and brake pads in reliance on their representations that the workmanship would involve new parts.

77.    Plaintiffs justifiably relied on T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs' representations in deciding to replace the rear tire and brake pads.

78.    Plaintiff could not know about T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs' negligent use of the used rim band until Plaintiff's expert's November 18, 2015 report.

79.    All of the injuries and damages complained of herein were foreseeable and proximately resulted from the fraudulent conduct of T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs.

80.    The above-described conduct by T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs was grossly negligent, willful, wanton, reckless, malicious and/or intentional.

81.    As a direct and proximate result of T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs' grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiffs Robert and Laura Haskett assert a

claim for judgment for all compensatory and punitive damages against Defendant T.N.H.D. Partners, LLC, d/b/a Harley-Davidson of Cool Springs and John Doe Defendant, including but not limited to, but not limited to, the physical injuries described herein, pain and suffering, mental anguish, Laura Haskett's disability, medical expenses, Laura Haskett's caretaking and custodial care, including any such damages reasonably certain to be incurred in the future, in an amount to be determined by the jury, plus the costs of this litigation, and all of the relief to which the Plaintiffs are entitled to by law, all in an amount in excess of that necessary for federal diversity jurisdiction.

## COUNT VI

## SPOUSAL CLAIM FOR LOSS OF CONSORTIUM AGAINST ALL DEFENDANTS

82.    Plaintiffs incorporate all of the allegations contained in Paragraphs 1 - 81.

83.    In addition to seeking recovery for their personal injuries, as alleged above, Robert Haskett also seeks recovery for loss of consortium.

84.    At all times material hereto, Robert Haskett and Laura Haskett were married.

85.    As a direct and proximate result of the Defendants' negligence, Robert Haskett suffered a loss of services, society, companionship, and conjugal relationship of Laura Haskett, and other damages caused by the negligence of the

Defendants in an amount in excess of that necessary for federal diversity jurisdiction.

## DEMAND FOR JURY TRIAL

86.     Plaintiffs demand that all issues of fact in this case be tried to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     For damages in an amount adequate to compensate Plaintiffs for the injuries and damages sustained and described herein.

2.     For all general and special damages caused by the alleged conduct of Defendants.

3.     For punitive damages sufficient to punish the Defendants for their egregious and malicious conduct in reckless disregard and conscious indifference to the consequences to Plaintiffs, and to deter similar conduct on the part of the Defendants or any others who may engage in similar conduct.

4.     For the costs of litigating this case.

5.     For all other relief to which Plaintiffs are entitled by law.

Respectfully Submitted,


By:   /s/ Melody H. Piazza
Melody H. Piazza- AR - 86108



**TRAMMELL PIAZZA LAW FIRM, PLLC**
1501 North University, Suite 350
Little Rock, Arkansas  72207
501-371-9903
501-371-9905 (Fax)
melody@trammellpiazza.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Melody H. Piazza, hereby certify that on November 29th, 2017, the attached document was delivered to the following counsel of record by electronic transmission via the Court's ECF system:

Michael E. Hale
Anthony J. Marelle
William H. Edwards, Jr.
Barber Law Firm, PLLC
425 West Capitol Avenue
Suite 3400
Little Rock, AR 72201
mhale@barberlawfirm.com
tmarelle@barberlawfirm.com
wedwards@barberlawfirm.com
*Attorneys for Power Prime Limited*

Thomas G. Williams
Michael B. Heister
Quattlebaum, Grooms & Tull, PLLC
111 Center Street, Suite 1900
Little Rock, AR 72201
twilliams@qgtlaw.com
mheister@qgtlaw.com
*Attorney for 4162 Doerr Road, Inc.*
*d/b/a Marshall Distributing, Inc.*

Michael McCarty Harrison
Watts, Donovan & Tilley, P.A.
200 River Market Avenue, Suite 200
Little Rock, AR 72201
michael.harrison@wdt-law.com
*Attorney for T.N.H.D. Partners, LLC*
*d/b/a Harley Davidson of Cool Springs*

By:   /s/ Melody H. Piazza_____

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

ROBERT HASKETT AND LAURA HASKETT       PLAINTIFFS

V.                NO. 3:16-cv-00047 BSM

T.N.H.D. PARTNERS, LLC d/b/a HARLEY DAVIDSON
OF COOL SPRINGS; *4162 DOERR ROAD, INC.
D/B/A* MARSHALL DISTRIBUTING, INC.;
*POWER PRIME LIMITED;* and JOHN DOE 1,
UNKNOWN DEFENDANT            DEFENDANTS

### AFFIDAVIT OF MELODY H. PIAZZA

STATE OF ARKANSAS )
               ) SS.
COUNTY OF PULASKI )

The undersigned, Melody H. Piazza, having been duly sworn, states upon oath and affirmation as follows:

1.    I am an attorney with Trammell Piazza Law Firm, PLLC, located at 1501 N. University, Suite 350, Little Rock, Arkansas 72207.

2.    Robert Haskett and Laura Haskett have employed Trammell Piazza Law Firm, PLLC as counsel to bring a cause of action against Defendants T.N.H.D. Partners, LLC d/b/a Harley-Davidson of Cool Springs; 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.; Power Prime Limited; and John Doe 1, Unknown Defendant.

EXHIBIT
A

1

3.      Plaintiffs are currently unable to identify all potential tortfeasors liable for Plaintiffs' claims, including John Doe 1, Unknown Defendant.

4.      Plaintiffs intend to serve discovery upon Defendants T.N.H.D. Partners, LLC d/b/a Harley-Davidson of Cool Springs; 4162 Doerr Road, Inc. d/b/a Marshall Distributing, Inc.; Power Prime Limited upon the service of this Second Amended Complaint in order to determine the identity of all tortfeasors.

I, Melody H. Piazza, state upon oath that the statements contained in the above and foregoing Affidavit are true and correct to the best of my knowledge and belief.

_____
Melody H. Piazza

Dated: ___10/27/17_____

## **ACKNOWLEDGEMENT**

On this the 27th day of October, 2017, before the undersigned officer, personally appeared Melody H. Piazza, known to be the person whose name is subscribed to in the above and foregoing Affidavit, and acknowledged that she executed the same for the purposes therein contained.

_____
NOTARY PUBLIC

My Commission Expires:

_5/23/23_____

CONNIE ANN STRAW
PULASKI COUNTY
NOTARY PUBLIC - ARKANSAS
My Commission Expires May 23, 2023
Commission No. 12394154

3

*Receipt for tire change.*
*14-053 Haskett*



# Harley-Davidson of Cool Springs
7128 South Springs Drive
**Franklin, TN 37067**
PH: (615) 771-7775 • FAX: (615) 771-7731

CELL: 501-269-528?

| CUSTOMER NO. | ADVISOR | | TAG NO. | INVOICE DATE | INVOICE NO. |
|---|---|---|---|---|---|
| **201031** | LARRY WILLIS | 189456 | 1283 | 07/21/14 | TNCS167733 |

| | LABOR RATE | LICENSE NO. | MILEAGE | COLOR | STOCK NO. |
|---|---|---|---|---|---|
| ROBERT HASKETT | | | 51,022 | / | |

| 47 SHOEMAKER CIRCLE | YEAR/MAKE/MODEL | | DELIVERY DATE | DELIVERY MILES |
|---|---|---|---|---|
| CONWAY, AR 72032 | 07/HARLEY DAVIDSON/FLHTCU | | | |

| | VEHICLE I.D. NO. | | SELLING DEAL PH NO. | PRODUCTION DATE |
|---|---|---|---|---|
| | 1 H D 1 F C 4 1 0 7 Y 7 0 1 2 8 3 | | | |

| RLHASKETT@GMAIL.COM | P.T.E. NO. | P.O. NO. | R.O. DATE |
|---|---|---|---|
| | | | 07/21/14 |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS |
|---|---|---|
| | | |

MO: 51026

**LABOR & PARTS**

JOB 1 080SZ      GENERAL CHASSIS                    TECH(S) 14351    102.00
          C/S REPLACE REAR TIRE
          COMPLETED

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| JOB # 1 | 1 | 43200001 | TIRE, RR, MU85016 | 211.95 | 211.95 |
| JOB # 1 | 1 | 43164-05 | RIM BAND, FITS 1 | 4.49 | 4.49 |
| JOB # 1 | 1 | 40575-05 | TUBE MT/MU90-16 | 33.95 | 33.95 |

JOB # 1 TOTAL PARTS    250.39

JOB # 1 TOTAL LABOR & PARTS    352.39

JOB 2 080SZ      GENERAL BRAKES                      TECH(S) 14351    25.00
          C/S REPLACE REAR BRAKE PADS
          COMPLETED
          TECH ALSO NOTED THAT NECK BEARING FEELS LOOSE

| PARTS | QTY | FP NUMBER | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|---|
| JOB # 2 | 1 | 44082-00D | BRAKE PAD KIT | 58.27 | 58.27 |

JOB # 2 TOTAL PARTS    58.27

JOB # 2 TOTAL LABOR & PARTS    83.77

| MISC | CODE | DESCRIPTION | CONTROL NO. | |
|---|---|---|---|---|
| JOB # A | SS | SHOP SUPPLIES CP | | 7.65 |

TOTAL MISC    7.65

TOTALS

```
**********************************
*                                *
*  [ ] CASH    [ ] CHECK    [ ] CREDIT CARD    *
*              #           CC TYPE             *
**********************************
```

THANK YOU FOR CHOOSING THE SERVICE DEPARTMENT
AT HARLEY-DAVIDSON OF COOL SPRINGS.
WE LOOK FORWARD TO SEEING YOU AGAIN.
****** ATTENTION ******
ALL TAKE OFF PARTS THAT ARE NOT PICKED UP ON THE DAY OF THAT
YOUR MOTORCYCLE IS PICKED UP WILL BE HELD FOR (5) DAYS
AFTER (5) BUSINESS DAYS ANY TAKE OFF PARTS THAT ARE NOT
PICKED UP WILL BE DISPOSED OF BY H-D OF COOL SPRINGS
SERVICE MANAGER - LARRY BRACE

|  | |
|---|---|
| TOTAL LABOR... | 127.50 |
| TOTAL PARTS... | 308.66 |
| TOTAL SUBLET... | 0.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 7.65 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 42.38 |
| **TOTAL INVOICE $** | **486.19** |

CUSTOMER SIGNATURE

**DISCLAIMER OF WARRANTY**

The only warranties applying to this part(s) are those which may be offered by the manufacturer. The selling dealer hereby expressly disclaims all warranties, either express or implied, including any implied warranties of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this part(s) and/or service. Buyer shall not be entitled to recover from the selling dealer any consequential damages, damages to property, damages for loss of use, loss of time, loss of profits or income, or any other incidental damages.

STORAGE CHARGES OF $15.00 PER DAY WILL BE INCURRED 3 WORKING DAYS AFTER YOU HAVE BEEN NOTIFIED THE REPAIRS ARE COMPLETED.

LIMITED WARRANTY: Parts and service is guaranteed for 90 days of 3,000 miles, whichever occurs first. Seller does not guarantee that the work performed in accordance with this estimate and/or repair order will correct any problem specified on the description of the complaint.

SHOP SUPPLIES: The Shop Supplies charge is calculated at a rate of 6% of labor charge, with a cap of $28.76.

Miscellaneous shop supplies may include, but are not limited to nuts, bolts, screws, washers, aerosol sprays, solvents, cleaning cloths, sealers, silicone treatment, metal clips, fasteners, acetylene, oxygen, welding rods, glass/fabric/vinyl cleaners, sponges, chamois, seat/fender protectors, compounds, etc.

*Thank You*
*for your*
*continued*
*patronage*

EXHIBIT
**B**

The Reynolds and Reynolds Company  BRA79HV6  026019 (9/99)